BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION

IN RE:  NATIONAL PRESCRIPTION OPIATE
LITIGATION                                                                                         MDL No. 2804

This Document Relates to:

*The Cherokee Nation v. McKesson Corporation et al.*
Case No. 18-CV-56-RAW (E.D. Okla.)

### CHEROKEE NATION'S OPPOSITION TO MOVANTS' MOTION TO VACATE CONDITIONAL REMAND ORDER

Defendants' Motion to Vacate should be denied because the Cherokee Nation's claim is both typical and representative of other Indian tribes involved in this litigation. The basic theory of the Cherokee Nation's case is that defendants' oversupply of prescription opioids through wholesale and retail channels harmed the Cherokee Nation in its sovereign capacity, created a nuisance, and that defendants are responsible for paying damages and abatement. This is the same theory asserted by hundreds of other federally-recognized Indian tribes in the MDL, and none of the allegedly "atypical" aspects of the Cherokee Nation's case would interfere with its ability to serve an exemplary bellwether upon its remand to Oklahoma. All Indian tribes—like all states, or all cities—have differences in their populations, geographies, governance, land, healthcare, and so on. But these differences are not *material* differences for purposes of opioid litigation. Movants have simply latched onto any arguably distinctive geopolitical characteristic of the Cherokee Nation in hopes of preventing remand. But these are false distinctions, contrived by Movants, driven by their apparent desire to avoid litigating against the Cherokee Nation in Oklahoma. Movants fail to even superficially explain how the purported "differences" among tribes have any necessary relevance to opioid litigation. The MDL court's suggestion for remand of *Cherokee Nation* is fully aligned with the court's stated objectives and principles governing selective

1

remand. The MDL court gave careful consideration to all the objections Movants raise in their motion to vacate, and nevertheless determined *Cherokee Nation* should be remanded. This Panel should sustain the court's decision, and deny the motion to vacate.

## BACKGROUND

On September 26, 2019, the parties attended a hearing before Judge Polster to discuss a process for remanding certain opioid cases—including at least one tribal case—to transferor jurisdictions for trial settings. About a month after the hearing, the parties submitted position papers, and then attended a second court conference on November 6, 2019 to resume the remand discussion.

In its November 5, 2019 position paper, the Plaintiffs' Executive Committee of the MDL ("PEC") proposed *Cherokee Nation v. McKesson* as a tribal remand candidate. (ECF No. 2906 at 9). The Distributors also submitted a position paper, which did not nominate a specific tribe, but it proposed a process for winnowing the candidates. (ECF No. 2908 at 3).[1] Distributors also proposed that any cases to be remanded should be remanded "in the entirety"—meaning the number of claims and defendants should not be streamlined by the MDL court as a condition of remand. *Id*. at 7.

At the status conference on November 6, 2019, Judge Polster summarized his thinking on the issues framed by the position papers. He indicated that cases to be remanded should, in fact, be streamlined to some extent. "No jury can focus for eight months," Judge Polster explained, "I want cases that juries can understand[.]" Nov. 6, 2019 Hr'g Tr. 9:24; 10:21-22. The cases should be "structured and focused" and should present "one or two legal theories"—i.e., such as the theory of distributor liability combined with the theory of dispensing liability—"that can be tried in my

---

[1] The Pharmacies' position paper did not address tribes.

view in about a month." *Id*. 4:12-16. Judge Polster invited another round of position papers from the parties before deciding which cases should be remanded.

The November 6 status conference did not establish any absolute rules or mandatory criteria governing which cases should be proposed for remand. The court instead articulated a set of principles and objectives. With respect to Indian tribes, Judge Polster viewed Cherokee Nation as the logical choice. *Id*. 29:23-25. Although he had not yet resolved which defendants and which claims should be tried in the *Cherokee* case, if that were the tribal case to be remanded, he noted that it should certainly involve fewer than "25 defendants and 10 causes of action." *Id*. 31:13-16; 32:19-20. By the same token, he also cautioned against remanding a tribal case with too few defendants. *Id*. 40:24-25.

On or about November 13, 2019, the parties submitted additional position papers. The PEC along with the MDL's "Tribal Leadership Committee"—the MDL committee whose members collectively represent the vast majority of all the Indian tribes involved in opioid litigation—advocated for remand of the Cherokee Nation's case. Plaintiffs' position paper explained that (1) the Cherokee Nation was generally representative of all Indian tribes in the MDL; (2) its opioid lawsuit was generally representative of tribal opioid litigation; and (3) Oklahoma was an appropriate jurisdiction for trial. (ECF No. 2935 at 9-10).

The Defendants disagreed. They proposed *Blackfeet Indian Reservation v. AmerisourceBergen Drug Corp., et al.* as the tribal bellwether—claiming among other things that *Blackfeet* had the advantage of naming companies at multiple levels of the supply chain as defendants. (ECF No. 2934 at 4). The Pharmacy Defendants echoed this claim by favorably pointing out Blackfeet had sued "a variety of defendants ***from all three industry groups***." (ECF No. 2933 at 2) (emphasis added). In other words, although the *Blackfeet* complaint involved more

3

claims, more defendants, and more legal theories than the Cherokee Nation's case, the Movants suggested this additional complexity of *Blackfeet* actually factored *in favor* of remand.

On November 19, 2019, the MDL court issued Suggestions of Remand. (ECF No. 2941). The court summarized its deep involvement in the Opiate MDL for the past two years, articulated objectives for the strategic remands, and identified *Cherokee Nation v. McKesson* as the tribal remand case. Judge Polster made this suggestion based on his determination that it was "the best way to advance resolution of various aspects of the Opiate MDL." (ECF No. 2941 at 7). This Panel subsequently entered a conditional remand order, and the Movants' motion to vacate predictably ensued.

## ARGUMENT

**A.   Remanding Cherokee Nation is consistent with Judge Polster's principles and objectives for strategic remands.**

Movants contend remanding Cherokee Nation would "directly contradict the standards for remand that the MDL court itself articulated." Mot. 1.[2] This argument fails for several reasons. First, Movants' argument is factually inaccurate. Their motion to vacate quotes (without full context) several comments by Judge Polster about streamlining cases. Almost none of these comments applied to the tribal bellwether case. In fact, when discussing *Cherokee Nation*'s remand, Judge Polster's guidance was essentially only that the case should involve more than two defendants, and less than 25. *See* Tr. 32:19-20; 40:24-25.

Second, Movants' argument is legally and logically flawed. The propriety of MDL remands is governed by JPML Rule 7.6, as well as case law providing that the transferee court has

---

[2] When Movants refer to the "standards for remand"—which they claim were breached by the court—they are merely referencing the general comments Judge Polster made at the November 6, 2019 hearing, which occurred at a time when there was ongoing consideration and debate about the evolving criteria for remand, and before the close of briefing on these issues.

4

broad discretion when it comes to making recommendations for strategic remand.[3] Movants do not substantively argue the MDL court abused its discretion or breached any substantive requirement of Rule 7.6 or the relevant case law. Rather, they seem to simply suggest that Judge Polster's comments during a status conference somehow set up a binding "standard" to which he was then required to strictly adhere, and that he allegedly did not do so. Movants have cited no authority for this novel position, and there is no support for it. Certainly any court is permitted to evolve from comments made at a status conference—especially in circumstances like these where the parties were subsequently directed to confer, and to file a number of additional briefs on the issues under consideration. In sum, Movants' central argument amounts to nothing more than an accusation that Judge Polster contradicted himself; even if this were true (which it is not), it is certainly not substantive grounds to upend the court's ultimate decision.

Third, Movants' argument is demonstrably hypocritical. They claim *Cherokee Nation* is too complex since it asserts four or five claims against six defendants from two levels of the supply chain.[4] Movants purport to be "confounded" that Judge Polster would suggest remand for a case with five claims against six defendants. Mot. 8. But Movants *themselves* urged Judge Polster to

---

[3] *See In re Asbestos Prod. Liab. Litig. (No. VI)*, 545 F. Supp. 2d 1362, 1363 (J.P.M.L. 2008) ("In considering the question of remand, the Panel has consistently given great weight to the transferee judge's determination that remand of a particular action at a particular time is appropriate because the transferee judge, after all, supervises the day-to-day pretrial proceedings." (internal citations omitted)); *In re Brand-Name Prescription Drugs Antitrust Litig.*, 264 F. Supp. 2d 1372, 1376 (J.P.M.L. 2003) ("[I]t is not surprising that the Panel consistently has given great weight to the transferee judge's informed determination that remand at a given point in time is appropriate.").

[4] Movants incorrectly claim the Cherokee Nation asserted five causes of action, one of them allegedly being "unfair and deceptive practices." There is no such claim in the Cherokee complaint. The counts are: Nuisance, Negligence, Negligence *Per Se*, Unjust Enrichment, and Civil Conspiracy. Because both negligence counts sound in the same cause of action—i.e., negligence—there are actually four substantive causes of action, all of which are based on essentially the same body of evidence.

remand an Indian tribe case with substantially *more* claims and *more* defendants. More specifically, Movants proposed *Blackfeet*—and they did so expressly because the case involved a greater mix of defendants from *all three* levels of the supply chain. So the sequence of events was that: Movants' proposed *Blackfeet*, with its higher number of claims and defendants, and Plaintiffs proposed *Cherokee Nation*, with its lower number of claims and defenses; then once Judge Polster decided upon *Cherokee*, Movants accused him of committing a "confounding" error because *Cherokee Nation* allegedly has too many claims and defendants. This position is disingenuous in the extreme and should be summarily rejected.

Movants assert some additional generic arguments about the burden they are facing in discovery of the Track 1 and Track 2 cases, and in defending four state-court cases. They claim it would be too expensive, burdensome, and ultimately unproductive to defend against an Indian tribe case, too. However, these arguments ignore the fact that Movants themselves agreed in principle to a tribal remand. They have not presented any reason for undoing the MDL court's careful determination—reached after multiple hearings and extensive briefing—that a tribal bellwether is necessary given the sovereign status of Indian tribes and the unique issues relating to the opioid epidemic facing the hundreds of tribal cases pending in the MDL. Moreover these movants, some of the largest and wealthiest corporations in the country, have not made a persuasive showing that they are unable to manage the "burden" of litigating one additional case against a single Indian tribe.

**B.     The Cherokee Nation's lawsuit is representative of tribal cases and will be practical as a bellwether.**

Movants raise several arguments specific to the geography and governance of the Cherokee Nation itself, which allegedly render *Cherokee Nation v. McKesson* a poor choice for remand. Movants made all of these arguments to the MDL court. They are all either greatly exaggerated or

6

completely immaterial, as explained below. As a preliminary point, however, it bears emphasizing that the MDL's Tribal Leadership Committee, whose members represent upwards of 80% of all of the American Indian/Alaska Native population in the opioid litigation, believes Cherokee Nation is representative of the other Indian tribes in the MDL, and should be the tribal bellwether case. (*See* ECF No. 2935 at 10-11).

Turning to Movants' specific objections,[5] Movants first contend that Cherokee Nation's size and the "checker-boarding" of state and tribal land within its jurisdictional area render it too complex for discovery. In particular, Movants claim this would result in having to take depositions of county officials in 14 counties, in addition to law enforcement officials from 50 different municipal, county, state, and federal agencies. This "parade of horribles" is vastly exaggerated, if not wholly made up. Case-specific discovery in *Cherokee Nation* will be manageable, and it will be generally representative of discovery that would occur in other tribal cases. Discovery will not involve discovery of 14 different counties in Oklahoma, and 50 different law enforcement agencies—because as a federally-recognized Indian tribe, the Cherokee Nation operates as a single sovereign entity, much like a state, and operates its own unitary tribal health care system. The MDL court specifically recognized this fact, and rejected Movants' argument about unmanageable discovery:

> THE COURT: Well, the entities, the Cherokee Nation is bringing the case and seeking damage on its own behalf. So any expenses, whatever, it comes from the Cherokee Nation. It wouldn't be through any county or county facilities. It would be here is what the Cherokee Nation claims that they've spent addressing the opioid crisis for its members. … They provide healthcare and services.

---

[5] Movants' arguments in their motion to vacate were taken almost verbatim from the Distributor defendants' position paper submitted to the MDL court on November 13, 2019, in which they asserted the same arguments against *Cherokee Nation*'s remand. (*See* ECF No. 2934).

Tr. 34:7-13. In short, it is irrelevant that the Cherokee Nation's tribal jurisdictional area, like the reservations of many other tribes, overlaps or partially overlaps with multiple counties.

It is also irrelevant that the Cherokee Nation's jurisdictional area includes a "checker-board" of tribal and non-tribal lands. Such "checker-boarding," which is very common on Indian reservations across the country, is the tragic result of late nineteenth century federal policy and legislation that was designed to "assimilate" Native Americans by forcing the sale of their tribal lands to white settlers. Because this was a nationwide federal policy, its effects are evident throughout Indian country to this day. It does not render Cherokee Nation atypical or unsuitable as a bellwether.

Movants relatedly argue that the ongoing appeals in the *Murphy* litigation may impact the Cherokee Nation's opioid case. Movants hint that the *Murphy* appeal could set the stage for some ominous-sounding developments, including the potential "disestablishment" of the Cherokee reservation and perhaps even wholesale "redraw[ing] the map of Oklahoma." Mot. 13-14, n. 15. All drama aside, however, the outcome of *Murphy* will not impact discovery or trial in *Cherokee Nation* whatsoever.

*Murphy* is about criminal jurisdiction—specifically, whether a murder committed by appellee Patrick Murphy took place within the boundary of the Muscogee (Creek) Nation Reservation such that, under federal law, criminal jurisdiction would lie in federal, not state, court. The issue to be decided by the Supreme Court is whether, as the State of Oklahoma contends, the Creek Reservation had been disestablished by Congress at the time of Oklahoma statehood over a century ago, so that jurisdiction in state court was proper. The Tenth Circuit decided in favor of Murphy, and held that the Creek Reservation had not been terminated by Congress and therefore that the state court which convicted Murphy lacked jurisdiction to do so

The outcome of *Murphy* with regard to the present day status of the Creek Reservation could (but not necessarily) affect the present day status of the Cherokee Nation Reservation which, in turn, could impact the scope of the Cherokee Nation's regulatory authority within its jurisdictional area. But even if all that comes to pass, Movants have not explained (and cannot explain) how this pertains in any way to the straight-forward issue in Cherokee Nation's opioid lawsuit—i.e., whether defendants' violated Oklahoma law in flooding Northeastern Oklahoma with prescription opioids and as a consequence caused economic harm to the Cherokee Nation as a sovereign government; one that is different and separate from state and local governments. The scope of the Cherokee Nation's regulatory authority is not at issue. All the claims are founded on state law (not tribal law), and the case is in federal court, not tribal court. Movants' argument about *Murphy* is simply a red herring.

Finally, Movants make several arguments related to the 2019 litigation by the State of Oklahoma against opioid manufacturers. However, Oklahoma's opioid litigation does not impact the Cherokee Nation's claims. The State's $465 million abatement award was the result of a single claim (public nuisance) against one manufacturing defendant, for only one year of funding for costs to be *incurred by the State* to operate the specific programs listed in the State's detailed "nuisance abatement plan." None of the "nuisance abatement plan" is earmarked for any program run by Cherokee Nation, nor for any past damages incurred by any Indian tribe. None of the money will be paid to Cherokee Nation or to any individual member of Cherokee Nation. There are simply no "double recovery" concerns presented by the Oklahoma opioid litigation.

Movants claim that Cherokee Nation is further "constrained under rules prohibiting double recoveries" because some Cherokee Nation members have dual Oklahoma citizenship. Mot. 14. This is a nonsensical argument for two reasons. First, *no* individual Oklahoma citizen—Cherokee

or otherwise—is receiving any money from the Oklahoma litigation. The money is going to the State. Therefore it is irrelevant whether some Cherokee members are Oklahoma citizens. Second, even if individual Cherokee Nation members theoretically did receive some monetary benefit from the Oklahoma litigation, this would have no legal or preclusive impact on the Cherokee Nation's own alleged damages. This is because Cherokee Nation is suing for damages incurred by the Nation in its sovereign capacity; it is not seeking damages for its individual members.

Next, Movants contend there is no advantage to trying a tribal bellwether case under Oklahoma law, because Oklahoma law relating to opioid claims is "already being developed." Mot. 13. On the contrary, Oklahoma is a perfect jurisdiction for the tribal bellwether, because its law is well developed. The MDL court has already analyzed hundreds of pages of briefing and ruled on all the threshold legal issues under Oklahoma law in motions to dismiss in the *Muscogee (Creek) Nation* case. *See Muscogee (Creek) Nation v. Purdue et al.*, 1:17-MD-2804, 2019 WL 3737023 (N.D. Ohio June 13, 2019) (ECF No. 1680). It is an advantage—not a disadvantage— that the Cherokee Nation's complaint has properly pled claims for relief under Oklahoma law. The Court's prior rulings on Oklahoma law will serve as law of the case. Remanding a case to an untested jurisdiction where the case could be dismissed on the pleadings would not help achieve the overarching purposes of advancing the MDL through discovery and trial of bellwether cases in other jurisdictions.

Movants relatedly contend Oklahoma appellate courts are "likely to clarify Oklahoma law as it relates to the opioid crisis." Mot. 14 n. 16. But this wrongly presumes a lack of clarity in existing Oklahoma law. In fact, law concerning opioid claims—and in particular, claims by Indian Tribes—is clearer in Oklahoma than in virtually any other jurisdiction, primarily because of the MDL court's extensive work and legal rulings on Oklahoma law in the MDL. *See Muscogee*

*(Creek) Nation*, *supra* (ruling on Oklahoma law pertaining to tribal opioid claims). Regardless, the possibility of appeals is not unique to Oklahoma. There will continue to be opioid-related appeals in many jurisdictions. This fact does not justify disturbing Judge Polster's determination that the Cherokee Nation would make the best tribal remand case for a trial in Oklahoma.

## CONCLUSION

For these reasons, the Cherokee Nation respectfully requests that this Panel deny Movants' motion to vacate the Panel's conditional remand order.


Dated: January 6, 2020.

                                                Respectfully Submitted,

                                                */s/ Tyler Ulrich*
                                                Tyler Ulrich
                                                BOIES SCHILLER FLEXNER LLP
                                                100 SE 2nd Street, Suite 2800
                                                Miami, Florida  33131
                                                tulrich@bsfllp.com
                                                Tel: (305) 539-8400

                                                William S. Ohlemeyer
                                                BOIES SCHILLER FLEXNER LLP
                                                333 Main Street
                                                Armonk, NY  10504
                                                wohlemeyer@bsfllp.com
                                                Tel: (914) 749-8440

                                                Attorney General Sara Hill
                                                Assistant Attorney General Chrissi Nimmo
                                                Assistant Attorney General John Young
                                                THE CHEROKEE NATION
                                                P.O. Box 948
                                                Tahlequah, OK 74464

                                                Richard Fields
                                                FIELDS LAW PLLC
                                                2000 Massachusetts Ave
                                                Washington, D.C. 20036

fields@fieldslawpllc.com
Tel: (917) 297-3610

Scott D. Gilbert
GILBERT LLP
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
gilberts@gilbertlegal.com

***ATTORNEYS FOR PLAINTIFF***